******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ROBINSON, J., with whom VERTEFEUILLE and ELGO, Js., join, dissenting in part. In 2005, Congress enacted the Protection of Lawful Commerce in Arms Act (arms act), 15 U.S.C. § 7901 et seq., to preempt what it had deemed to be frivolous lawsuits against the firearms industry arising from the proliferation of gun related deaths resulting from criminal activity in cities and towns across the country. See 15 U.S.C. § 7901 (2012) (articulating findings and purposes underlying arms act).[1] That preemption is not, however, unconditional, as there are six exceptions to the definition of "qualified civil liability action" set forth in 15 U.S.C. § 7903 (5) (A)[2] that narrow the category of cases proscribed by the arms act. See 15 U.S.C. § 7902 (2012).[3] One such exception, for "an action in which a manufacturer or seller of a [firearm, ammunition, or component part] knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought"; 15 U.S.C. § 7903 (5) (A) (iii) (2012); "has come to be known as the 'predicate exception,' because a plaintiff not only must present a cognizable claim, he or she also must allege a knowing violation of a 'predicate statute.' " *Ileto* v. *Glock, Inc.*, 565 F.3d 1126, 1132 (9th Cir. 2009), cert. denied, 560 U.S. 924, 130 S. Ct. 3320, 176 L. Ed. 2d 1219 (2010). In part V of its opinion, the majority concludes that the claims made by the plaintiffs[4] under the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., which are founded on a theory that wrongful and unscrupulous advertising by the defendants,[5] who manufactured, distributed, and sold the Bushmaster AR-15 rifle, Model XM15-E2S, was a substantial factor in the criminal activity of the shooter at the Sandy Hook School on December 14, 2012, are not preempted by the arms act because CUTPA is a predicate statute for purposes of the predicate exception. Having considered the text and legislative history of the arms act, I adopt a contrary answer to this national question of first impression, and conclude that the predicate exception encompasses only those statutes that govern the sale and marketing of firearms and ammunition specifically, as opposed to generalized unfair trade practices statutes that, like CUTPA, govern a broad array of commercial activities. Because the distastefulness of a federal law does not diminish its preemptive effect, I would affirm the judgment of the trial court striking the plaintiff's complaint in its entirety. Accordingly, I respectfully dissent from part V of the majority opinion.

I begin by noting my agreement with the facts, procedural history, and plenary standard of review as stated by the majority. See, e.g., *Byrne* v. *Avery Center for Obstetrics & Gynecology, P.C.*, 314 Conn. 433, 447, 102

A.3d 32 (2014) ("[w]hether state causes of action are preempted by federal statutes and regulations is a question of law over which our review is plenary"). I also assume, without deciding, that the majority properly concludes in part IV D of its opinion that, "at least with respect to wrongful advertising claims, personal injuries alleged to have resulted directly from such advertisements are cognizable under CUTPA." Accordingly, I now turn to the pivotal question of whether the predicate exception saves such claims under CUTPA from preemption by the arms act.

I

GENERAL PRINCIPLES OF PREEMPTION AND
STATUTORY CONSTRUCTION

I recognize that the supremacy clause of the United States constitution declares that "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. "As a consequence, state and local laws are preempted [when] they conflict with the dictates of federal law, and must yield to those dictates. . . . Preemption may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose. . . .

"[When] a federal statute expressly preempts state or local law, analysis of the scope of the [preemption] statute must begin with its text. . . . And, we must also start with the assumption that the historic police powers of the [s]tates [are] not to be superseded . . . unless that was the clear and manifest purpose of Congress. . . . As such, Congress' purpose is the ultimate touchstone of preemption analysis." (Citation omitted; internal quotation marks omitted.) *Modzelewski's Towing & Recovery, Inc.* v. *Commissioner of Motor Vehicles*, 322 Conn. 20, 28–29, 139 A.3d 594 (2016), cert. denied,      U.S.      , 137 S. Ct. 1396, 197 L. Ed. 2d 554 (2017).

In determining whether Congress intended the arms act to preempt the CUTPA claims in the present case, I turn to the principles that govern our "construction and application of federal statutes," under which "principles of comity and consistency require us to follow the plain meaning rule . . . . Moreover, it is well settled that the decisions of [t]he [United States Court of Appeals for the] Second Circuit . . . carry particularly persuasive weight in the interpretation of federal statutes by Connecticut state courts." (Internal quotation marks omitted.) *CCT Communications, Inc.* v. *Zone Telecom, Inc.*, 327 Conn. 114, 140, 172 A.3d 1228 (2017); see also, e.g., *Modzelewski's Towing & Recovery, Inc.* v. *Commissioner of Motor Vehicles*, supra, 322 Conn. 32.

"Accordingly, our analysis of the federal statutes in

the present case begins with the plain meaning of the statute. . . . If the text of a statute is ambiguous, then we must construct an interpretation consistent with the primary purpose of the statute as a whole. . . . Under the plain meaning rule, [l]egislative history and other tools of interpretation may be relied upon only if the terms of the statute are ambiguous. . . . Thus, our interpretive process will begin by inquiring whether the plain language of [each] statute, when given its ordinary, common meaning . . . is ambiguous." (Citations omitted; internal quotation marks omitted.) *Szewczyk* v. *Dept. of Social Services*, 275 Conn. 464, 476, 881 A.2d 259 (2005). "The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *State* v. *Agron*, 323 Conn. 629, 634, 148 A.3d 1052 (2016); see also, e.g., *United States* v. *Peterson*, 394 F.3d 98, 105 (2d Cir. 2005); *United States* v. *Dauray*, 215 F.3d 257, 262 (2d Cir. 2000).

If a federal statute is ambiguous, the federal courts do not consider all extratextual sources to be of equal value in resolving that ambiguity. Instead, the Second Circuit first "turn[s] to canons of statutory construction for assistance in interpreting the statute. . . . [That court] resort[s] to legislative history only if, after consulting canons of statutory instruction, the meaning remains ambiguous." (Citation omitted; internal quotation marks omitted.) *United States* v. *Rowland*, 826 F.3d 100, 108 (2d Cir. 2016), cert. denied,     U.S.    , 137 S. Ct. 1330, 197 L. Ed. 2d 517 (2017).

Accordingly, I begin with a review of the text of the relevant provisions of the arms act. The preemption provision provides that "[a] qualified civil liability action may not be brought in any Federal or State court." 15 U.S.C. § 7902 (a) (2012); see also 15 U.S.C. § 7902 (b) (2012) ("[a] qualified civil liability action that is pending on October 26, 2005, shall be immediately dismissed by the court in which the action was brought or is currently pending"). The arms act defines a "qualified civil liability action" in relevant part as "a civil action or proceeding . . . brought by any person against a manufacturer or seller of a qualified product,[6] or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party . . . ." (Footnote added.) 15 U.S.C. § 7903 (5) (A) (2012). The arms act then provides six exceptions to the definition of qualified civil liability action; see footnote 2 of this dissenting opinion; including the predicate exception, which is defined as "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought, including—

"(I) any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a qualified product; or

"(II) any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of title 18 . . . ." 15 U.S.C. § 7903 (5) (A) (iii) (2012).

Resolving whether CUTPA is a state statute "applicable to the sale or marketing of [firearms]"; 15 U.S.C. § 7903 (5) (A) (iii) (2012); begins with the plain meaning of the word "applicable," which Congress did not define within the arms act. "In the absence of a definition of terms in the statute itself, [w]e may presume . . . that the legislature intended [a word] to have its ordinary meaning in the English language, as gleaned from the context of its use. . . . Under such circumstances, it is appropriate to look to the common understanding of the term as expressed in a dictionary." (Internal quotation marks omitted.) *Middlebury* v. *Connecticut Siting Council*, 326 Conn. 40, 49, 161 A.3d 537 (2017). Merriam Webster's Collegiate Dictionary defines "applicable" as "capable of or suitable for being applied: appropriate." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003), p. 60; see id., p. 61 (defining "appropriate" as "especially suitable or compatible"). Considering this definition, I agree with the plaintiffs' argument that CUTPA reasonably could be deemed "applicable" to the "sale or marketing of [firearms]"; 15 U.S.C. § 7903 (5) (A) (iii) (2012); insofar as it is a broad statute that is "capable of" being applied to that—and nearly every other—business. The reasonableness of this reading is bolstered by Congress' use of the word "including" to set off its list of example predicate statutes, insofar as "the word 'including' may be used either as a word of enlargement or of limitation." *Wood* v. *Zoning Board of Appeals*, 258 Conn. 691, 700 n.11, 784 A.2d 354 (2001); see also, e.g., *State* v. *DeFrancesco*, 235 Conn. 426, 435, 668 A.2d 348 (1995) (" '[t]here is some ambiguity concerning whether the word "including" . . . was intended as a word of limitation . . . or one of enlargement' "); accord *Samantar* v. *Yousuf*, 560 U.S. 305, 317, 130 S. Ct. 2278, 176 L. Ed. 2d 1047 (2010) (stating that "use of the word 'include' can signal that the list that follows is meant to be illustrative rather than exhaustive," but noting that " '[a] word may be known by the company it keeps' "); but see *Mahoney* v. *Lensink*, 213

Conn. 548, 569, 569 A.2d 518 (1990) (suggesting that phrase "shall include" is limiting, but use of word "include" or "including" omitting word "shall" is intended to be broader, with "the listed rights . . . a vehicle for enlargement rather than limitation," given purpose of statutory patients' bill of rights).

The defendants' reading of the predicate exception is, however, equally reasonable, particularly given the more technical definition of "applicable" in Black's Law Dictionary as it relates to laws or regulations. See Black's Law Dictionary (10th Ed. 2014) (defining "applicable" in references to "a rule, regulation, law, etc.," as "affecting or relating to a particular person, group, or situation; having direct relevance"). The principle of noscitur a sociis, namely, that the "meaning of a statutory word may be indicated, controlled or made clear by the words with which it is associated in the statute"; (internal quotation marks omitted) *State* v. *Agron*, supra, 323 Conn. 635–36; allows us to view the example predicates, which describe statutes specifically applicable to the firearms trade, as cabining the more expansive reading of the word "applicable." See also, e.g., *Bilski* v. *Kappos*, 561 U.S. 593, 604, 130 S. Ct. 3218, 177 L. Ed. 2d 792 (2010). Consistent with the two United States Courts of Appeal that have considered the meaning of the predicate exception; see *Ileto* v. *Glock, Inc.*, supra, 565 F.3d 1133–34; *New York* v. *Beretta U.S.A. Corp.*, 524 F.3d 384, 401 (2d Cir. 2008), cert. denied, 556 U.S. 1104, 129 S. Ct. 1579, 173 L. Ed. 2d 675 (2009); I conclude that there is more than one reasonable reading of the predicate exception, rendering it ambiguous. I turn, therefore, to extratextual evidence, namely, the canons of statutory construction and, if necessary, the legislative history, to answer the question of whether CUTPA constitutes a predicate statute for purposes of 15 U.S.C. § 7903 (5) (A) (iii).

## II

### REVIEW OF FEDERAL CIRCUIT COURT PRECEDENT

In determining whether CUTPA is a predicate statute under the arms act, I do not write on a blank slate. Two of the United States Circuit Courts of Appeal, including the Second Circuit that we ordinarily find especially persuasive in deciding questions of federal law; see, e.g., *CCT Communications, Inc.* v. *Zone Telecom, Inc.*, supra, 327 Conn. 140; have considered whether state statutes of general applicability may be predicate statutes.

In *New York* v. *Beretta U.S.A. Corp.*, supra, 524 F.3d 389–91, the city of New York claimed that the defendants, certain firearms manufacturers and distributors, "market[ed] guns to legitimate buyers with the knowledge that those guns [would] be diverted through various mechanisms into illegal markets" and sought injunctive relief requiring those defendants "to take

assorted measures that would effectively inhibit the flow of firearms into illegal markets." The Second Circuit considered whether a state criminal public nuisance statute; see N.Y. Penal Law § 240.45 (McKinney 2008);[7] constituted a predicate statute that would allow the city's claim to avoid preemption under the arms act. *New York* v. *Beretta U.S.A. Corp.*, supra, 399; see also id. ("[i]t is not disputed that [the criminal nuisance statute] is a statute of general applicability that has never been applied to firearms suppliers for conduct like that complained of by the [c]ity"). The city argued that the predicate exception saved its action "because [the criminal nuisance statute] is a statute 'applicable to the sale or marketing of [firearms].' The [defendants] disagree[d], arguing that the predicate exception was intended to include statutes that specifically and expressly regulate the firearms industry." Id.

After engaging in a contextual analysis of the predicate exception and, in particular, the meaning of the term "applicable," the Second Circuit concluded that the predicate exception "does not encompass" the criminal nuisance statute, but "does encompass statutes [1] that expressly regulate firearms, or [2] that courts have applied to the sale and marketing of firearms; and . . . [3] that do not expressly regulate firearms but that clearly can be said to implicate the purchase and sale of firearms." Id., 404. In reaching that conclusion, the court stated that it found "nothing in the [arms act] that requires any express language regarding firearms to be included in a statute in order for that statute to fall within the predicate exception" and declined "to foreclose the possibility that, under certain circumstances, state courts may apply a statute of general applicability to the type of conduct that the [c]ity complains of, in which case such a statute might qualify as a predicate statute." Id., 399–400. Accordingly, the court concluded that "while the mere absence in [the criminal nuisance statute] of any express reference to firearms does not, in and of itself, preclude that statute's eligibility to serve as a predicate statute under the [arms act, the criminal nuisance statute] is a statute of general applicability that does not encompass the conduct of firearms manufacturers of which the [c]ity complains. It therefore does not fall within the predicate exception to the claim restricting provisions of the [arms act]." Id., 400.

My review of the relevant statutory text and legislative history reveal no support for the Second Circuit's expansive holding that the predicate exception includes statutes "that courts have applied to the sale and marketing of firearms" and "that do not expressly regulate firearms but that clearly can be said to implicate the purchase and sale of firearms." Id., 404. This ultimate conclusion is simply inconsistent with the court's more detailed analysis of the relevant statutory text and legislative history, which suggests a narrower reading of

that exception. Specifically, the court considered the statements of purpose, as well as the list of example predicate statutes set forth in 15 U.S.C. § 7903 (5) (A) (iii) (I) and (II), which are "said to include statutes regulating [record keeping] and those prohibiting participation in direct illegal sales," and stated that "construing the term 'applicable to' to mean statutes that clearly can be said to regulate the firearms industry more accurately reflects the intent of Congress." Id., 402. The court also rejected the dictionary definition of "applicable" as "lead[ing] to a far [too] broad reading of the predicate exception" that "would allow the predicate exception to swallow the statute . . . ." Id., 403. Finally, the court cited the legislative history of the arms act as "support [for] the view that the predicate exception was meant to apply only to statutes that actually regulate the firearms industry, in light of the statements' consistency amongst each other and with the general language of the statute itself." Id., 404.

Indeed, Judge Robert Katzmann authored a dissenting opinion aptly criticizing the majority's analysis as inconsistent with the plain language of the statute, particularly with respect to recognizing those statutes that courts had previously applied to the sale and manufacture of firearms, and further observed that the majority had provided no guidance with respect to when a statute of general applicability could, in fact, be deemed applicable to firearms, rendering that aspect of the majority opinion entirely unpersuasive.[8] See id., 406. Accordingly, I decline to follow the analysis of the Second Circuit's ultimately unpersuasive decision, particularly given that any concerns regarding different outcomes in federal court; see *Turner* v. *Frowein*, 253 Conn. 312, 341, 752 A.2d 955 (2000) (declining to follow Second Circuit precedent would create "bizarre result" when federal district court, located "only a few blocks away," would be bound under same facts); as a result of such a departure would be minimized because that case did not specifically involve a claim raised under a state unfair trade practices law.[9]

Although it too is not directly on point, my review of the predicate exception's text and legislative history indicates that the analysis of the United States Court of Appeals for the Ninth Circuit in *Ileto* v. *Glock, Inc.*, supra, 565 F.3d 1126, is more instructive.[10] In *Ileto*, the Ninth Circuit considered whether the predicate exception saved the plaintiff's claims of "knowing violations" of negligence, nuisance, and public nuisance under "California's general tort law [that] is codified in its civil code." Id., 1132–33. Observing "that the term 'applicable' has a spectrum of meanings, including the two poles identified by the parties," the Ninth Circuit considered the context of Congress' use of the word "applicable," as well as "the broader context of the statute as a whole." (Internal quotation marks omitted.) Id., 1134. The court stated that the "illustrative predicate statutes

pertain specifically to sales and manufacturing activities, and most also target the firearms industry specifically. Those examples suggest that [the] [p]laintiffs' proposed all-encompassing meaning of the term 'applicable' is incorrect, because each of the examples has— at the very least—a direct connection with sales or manufacturing. Indeed, if *any* statute that 'could be applied' to the sales and manufacturing of firearms qualified as a predicate statute, there would be no need to list examples at all. Similarly, the examples suggest that [the] [d]efendants' asserted narrow meaning is incorrect, because some of the examples do not pertain exclusively to the firearms industry." (Emphasis in original.) Id.

Determining that the "text of the statute alone is inconclusive as to Congress' intent," the court then considered "the additional indicators of congressional intent." Id., 1135. In particular, the court observed that the express purpose of the arms act is to " 'prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended.' " Id., quoting 15 U.S.C. § 7901 (b) (1) (2006). The court determined that, in "view of [the] congressional findings and that statement of purpose, Congress clearly intended to preempt common-law claims, such as general tort theories of liability. [The] [p]laintiffs' claims—'classic negligence and nuisance'—[are] general tort theories of liability that traditionally have been embodied in the common law." (Citation omitted; footnote omitted.) *Ileto* v. *Glock, Inc.*, supra, 565 F.3d 1135. The court emphasized that the California legislature did not intend to supplant the common law by enacting its civil code, but rather "to announce and formulate existing common law principles and definitions for purposes of orderly and concise presentation and with a distinct view toward continuing judicial evolution. . . . In other words, although California has codified its common law, the evolution of those statutes is nevertheless subject to the same judicial evolution as ordinary common-law claims in jurisdictions that have not codified common law. That judicial evolution was precisely the target of the [arms act]." (Citation omitted; internal quotation marks omitted.) Id., 1136. The Ninth Circuit deemed it "more likely that Congress had in mind only these types of statutes—statutes that regulate manufacturing, importing, selling, marketing, and using firearms or that regulate the firearms industry—rather than general tort theories that happened to have been codified by a given jurisdiction." Id.

The Ninth Circuit then examined the "extensive" legislative history, and made "two general observations . . . . First, all of the congressional speakers' state-

ments concerning the scope of the [arms act] reflected the understanding that manufacturers and sellers of firearms would be liable only for statutory violations concerning firearm regulations or sales and marketing regulations." Id., 1136–37. Second, the court observed that the "very case" before it was exactly "the type of case they meant the [arms act] to preempt," along with other "novel" cases. (Emphasis omitted.) Id., 1137. Ultimately, the court held that "Congress intended to preempt general tort law claims . . . even though California has codified those claims in its civil code."[11] Id., 1138. Unlike the Second Circuit, however, the Ninth Circuit expressly demurred to state "any view on the scope of the predicate exception with respect to any other statute." Id., 1138 n.9; see also *District of Columbia* v. *Beretta U.S.A. Corp.*, 940 A.2d 163, 170–72 (D.C. 2008) (concluding that District of Columbia's Assault Weapons Manufacturing Strict Liability Act, D.C. Code § 7-2551.01 et seq. [2001], is not predicate statute because it is pure strict liability, and does not provide "a prohibition against, or standards of, conduct that are being violated," with plaintiffs' claims preempted because they did not allege that "defendants knowingly violated any proscriptions or requirements of local or federal law governing the sale or possession of firearms"), cert. denied sub nom. *Lawson* v. *Beretta U.S.A. Corp.*, 556 U.S. 1104, 129 S. Ct. 1579, 173 L. Ed. 2d 675 (2009).

With this case law in mind, I now turn to the canons of statutory interpretation and legislative history to determine whether the predicate exception encompasses unfair trade practices statutes that, like CUTPA, are not specific to the firearms industry.

### III

### CANONS OF CONSTRUCTION

With respect to the canons of statutory construction, I first observe that the predicate exception is exactly that—an *exception* to the arms act. It is well settled that, "when a statute sets forth exceptions to a general rule, we generally construe the exceptions narrowly in order to preserve the primary operation of the [provision]." (Internal quotation marks omitted.) *Capitol Records, LLC* v. *Vimeo, LLC*, 826 F.3d 78, 90–91 (2d Cir. 2016), cert. denied,    U.S.   , 137 S. Ct. 1374, 197 L. Ed. 2d 554 (2017). This "proposition . . . is supported by commonsense logic. When a statute sets forth a general principle, coupled with an exception to it, it is logical to assume, in the face of ambiguity in the exception, that the legislature did not intend the exception to be so broad as to leave nothing of the general principle." Id., 91; see also *Commissioner of Internal Revenue* v. *Clark*, 489 U.S. 726, 739, 109 S. Ct. 1455, 103 L. Ed. 2d 753 (1989) ("[g]iven that Congress has enacted a general rule that treats boot as capital gain, we should not eviscerate that legislative judgment through an

expansive reading of a somewhat ambiguous exception"); *A. H. Phillips, Inc.* v. *Walling*, 324 U.S. 490, 493, 65 S. Ct. 807, 89 L. Ed. 1095 (1945) ("[t]o extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people"). In the absence of clear direction from Congress to construe the predicate exception differently, I disagree with the majority's suggestion that we should read the arms act narrowly and its predicate exception more broadly.[12] See *Reves* v. *Ernst & Young*, 507 U.S. 170, 183–84, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993) (" '[L]iberal construction' " clause in Racketeer Influenced and Corrupt Organizations Act [RICO], 18 U.S.C. § 1961 et seq. [1988], which "obviously seeks to ensure that Congress' intent is not frustrated by an overly narrow reading of the statute . . . is not an invitation to apply RICO to new purposes that Congress never intended. Nor does the clause help us to determine what purposes Congress had in mind. Those must be gleaned from the statute through the normal means of interpretation. The clause only serves as an aid for resolving an ambiguity; it is not to be used to beget one." [Internal quotation marks omitted.]).

Beyond the narrow construction that we should afford the exceptions to the arms act, the related doctrines of noscitur a sociis and avoiding legislative superfluity also inform the meaning of the phrase "State or Federal statute applicable to the sale or marketing of [firearms]"; 15 U.S.C. § 7903 (5) (A) (iii) (2012); and suggest that the examples of federal laws provided therein indicate the type of statutory violations that would sustain invocation of the predicate exception. Under the canon of noscitur a sociis, "an ambiguous term may be given more precise content by the neighboring words with which it is associated."[13] (Internal quotation marks omitted.) *Bilski* v. *Kappos*, supra, 561 U.S. 604; see also *Yates* v. *United States*, U.S. , 135 S. Ct. 1074, 1085, 191 L. Ed. 2d 64 (2015) ("we rely on the principle of noscitur a sociis—a word is known by the company it keeps—to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the [a]cts of Congress" [internal quotation marks omitted]). "By using this interpretive aid, the meaning of a statutory word may be indicated, controlled or made clear by the words with which it is associated in the statute." (Internal quotation marks omitted.) *State* v. *Agron*, supra, 323 Conn. 636. "As a result, broader terms, when used together with more narrow terms, may have a more restricted meaning than if they stand alone." *Dattco, Inc.* v. *Commissioner of Transportation*, 324 Conn. 39, 48, 151 A.3d 823 (2016). This is particularly so, given this canon's relationship to the doctrine that "the [c]ourt will avoid a reading which renders some words altogether redundant." *Gus-*

*tafson* v. *Alloyd Co., Inc.*, 513 U.S. 561, 574, 115 S. Ct. 1061, 131 L. Ed. 2d 1 (1995); accord *Lopa* v. *Brinker International, Inc.*, 296 Conn. 426, 433, 994 A.2d 1265 (2010) ("[b]ecause [e]very word and phrase [of a statute] is presumed to have meaning [a statute] must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant" [internal quotation marks omitted]).

The very specific examples of firearms laws that Congress provides in the predicate exception strongly suggest that it intended only those statutes that are specific to the firearms trade to be considered "applicable to the sale or marketing of the product . . . ." 15 U.S.C. § 7903 (5) (A) (iii) (2012). The first example is "any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a qualified product . . . ." 15 U.S.C. § 7903 (5) (A) (iii) (I) (2012). The second is "any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of title 18 . . . ." 15 U.S.C. § 7903 (5) (A) (iii) (II) (2012). Had Congress intended the predicate exception to broadly encompass *any* statute capable of application to the manufacture or sale of anything, the inclusion of those firearms-specific examples would be superfluous.[14] See *Yates* v. *United States*, supra, 135 S. Ct. 1087 ("Had Congress intended 'tangible object' in [18 U.S.C.] § 1519 to be interpreted so generically as to capture physical objects as dissimilar as documents and fish, Congress would have had no reason to refer specifically to 'record' or 'document.' The Government's unbounded reading of 'tangible object' would render those words misleading surplusage."); *Gustafson* v. *Alloyd Co.*, supra, 513 U.S. 574–75 (interpreting Securities Act of 1933 and stating that "[i]f 'communication' included every written communication, it would render 'notice, circular, advertisement, [and] letter' redundant, since each of these are forms of written communication as well"); *Dattco, Inc.* v. *Commissioner of Transportation*, supra, 324 Conn. 48–49 ("The legislature's grouping [in General Statutes (Rev. to 2015) § 13b-36 (a)] of the term 'facilities' with other nouns that all denote tangible objects favors a conclusion that the term 'facilities' also refers to tangible objects other than land, buildings, and equipment that might be used in a transportation system. Moreover, interpreting 'facilities' to mean only tangible items

does not render it superfluous or redundant with respect to the terms 'land,' 'buildings,' or 'equipment,' as the commissioner suggests. The term 'facilities' embraces numerous tangible items—other than land, buildings, or equipment—including bridges . . . docks . . . side railroad tracks that are part of a rail system . . . dams and reservoirs . . . and even horses." [Citations omitted.]). Although a reading of the predicate exception that is informed by the canons of construction strongly favors the defendants, the plaintiffs' proffered reading of the statute remains reasonable, insofar as "we do not woodenly apply limiting principles every time Congress includes a specific example along with a general phrase." *Ali* v. *Federal Bureau of Prisons*, 552 U.S. 214, 227, 128 S. Ct. 831, 169 L. Ed. 2d 680 (2008). Accordingly, I continue to consider the legislative history of the arms act in determining whether a predicate statute must specifically relate to the firearms industry.

IV

LEGISLATIVE HISTORY

The legislative history also supports a narrow reading of the predicate exception as limited only to those statutes that govern the sale and marketing of firearms specifically. I agree with the majority's description of the legislative history of the arms act as "extensive" and "present[ing] something of a mixed bag."[15] I disagree, however, with the majority's conclusion that the legislative history demonstrates that "Congress did not intend to limit the scope of the predicate exception to violations of firearms specific laws or to confer immunity from all claims alleging that firearms sellers violated unfair trade practice laws." Consistent with the purpose of the arms act as set forth in 15 U.S.C. § 7901; see footnote 1 of this dissenting opinion; much of the legislative history consists of broad statements by supporters of the arms act about saving the American firearms industry from "predatory," "abusive," and "frivolous" lawsuits, sanctioned by "sympathetic activist judges," seeking "damages resulting from the criminal or unlawful misuse of a firearm or ammunition by a third party."[16] 151 Cong. Rec. 18,057–58 (2005), remarks of Senator Larry Edwin Craig and Senator Thomas Allen Coburn; see, e.g., id., 2315–16, remarks of Representative Clifford Bundy Stearns (introducing House bill); id., 18,057, remarks of Senator Craig ("[t]hese predatory lawsuits are aimed at bankrupting the firearms industry" and "all seek the same goal of forcing law-abiding businesses selling a legal product to pay for damages from the criminal misuse of that product," which would threaten "a domestic industry that is critical to our national defense" and jeopardize "hundreds of thousands of good paying jobs"); id., 18,058, remarks of Senator Coburn ("[A]nti-gun activists have found another way to constrict the right to bear arms and attack the Bill

of Rights and attack the [United States] [c]onstitution, and that is through frivolous litigation. . . . [These] novel lawsuits . . . are not intended to create a solution. They are intended to drive the gun industry out of business by holding manufacturers and dealers liable for the intentional and criminal act[s] of third parties over whom they have absolutely no control."); see also id., 18,070, remarks of Senator William H. Frist; id., 18,072–73, remarks of Senator Lindsey Graham; id., 18,073, remarks of Senator Orrin Grant Hatch; id., 18,914, remarks of Senator Kathryn Ann Bailey Hutchison; id., 18,924, remarks of Senator Jefferson Beauregard Sessions III.

Turning beyond the more sweeping remarks, to the extent that there is legislative history illuminating the meaning of the predicate exception, it "reflect[s] the understanding that manufacturers and sellers of firearms would be liable only for statutory violations concerning firearm regulations or sales and marketing regulations." *Ileto* v. *Glock, Inc.*, supra, 565 F.3d 1137. Thus, the legislative debate, much of which was intended to provide assurances that the arms act would not preempt claims against the dealers who violated numerous firearms sale laws in selling the Bushmaster rifle used by the beltway snipers; see, e.g., H.R. Rep. No. 109-124, p. 92 (2005), remarks of Representative Melvin L. Watt; supports an interpretation of predicate statutes as those specifically regulating the sale or marketing of firearms, such as those governing the tracking of inventory by firearms dealers.[17] For example, Senator Craig explained that the "bill does not shut the courthouse door," insofar as "plaintiffs will have the opportunity to argue that their case falls under the exception, such as violations of [f]ederal and [s]tate law . . . that you have knowingly sold a firearm to a person who cannot legally have it or who you have reason to believe could use it for a purpose other than intended. That all comes under the current definition of [f]ederal law." 151 Cong. Rec. 18,057–58 (2005). In contending that the arms act does not reduce "personal accountability" for firearms manufacturers, given its exceptions, Senator Coburn emphasized that "gun manufacturers and sellers are already policed enough, too much, through hundreds of pages of statutes, hundreds of pages of regulations. To name a few sources of regulations of guns and ammunition: the Internal Revenue Code, including the National Firearms Act postal regulations restricting shipping of handguns; [f]ederal explosive law; regulations for gunpowder and ammunition manufacture; the Arms Export Control Act; the Commerce Department export regulations; the Department of Transportation regulations on ammunition explosives and hazardous material transport. In addition to keeping explicit records that can be inspected by . . . the Bureau of Alcohol, Tobacco, Firearms, and Explosives, licensed dealers have to conduct a [f]ederal criminal

background check . . . . All retail gun buyers are screened to the best of the [g]overnment's ability." Id., 18,059–60; see also id., 19,119, remarks of Senator Sessions (emphasizing that arms act "allows lawsuits for violation of contract, for negligence, in not following the rules and regulations and for violating any law or regulation that is part of the complex rules that control sellers and manufacturers of firearms"). Similarly, when introducing the final Senate bill in the House, Representative Phil Gingrey explained that the predicate exception "would specifically allow lawsuits against firearms dealers such as the dealer whose firearm ended up in the hands of the [beltway] snipers who failed to maintain a required inventory list necessary to ensure that they are alerted to any firearm thefts." Id., 23,020.

Moreover, the majority does not cite, and my independent research has not revealed, any legislative history indicating that state unfair trade practice statutes were within the contemplation of Congress in enacting the predicate exception. Other statements indicate that such statutes were not contemplated as predicates, and that supporters of the arms act specifically rejected the viability of claims arising from the advertising of firearms. For example, arguing in support of the arms act, Senator Hatch criticized pending actions against gun manufacturers, observing that these "lawsuits, *citing deceptive marketing or some other pretext*, continue to be filed in a number of [s]tates, and they continue to be unsound. *These lawsuits claim that sellers give the false impression that gun ownership enhances personal safety or that sellers should know that certain guns will be used illegally*. That is pure bunk. Let's look at the truth. The fact is that none of these lawsuits are aimed at the actual wrongdoer who kills or injures another with a gun—none. Instead, the lawsuits are focused on legitimate, law-abiding businesses."[18] (Emphasis added.) 151 Cong. Rec. 18,073; see also id. (noting that arms act "provides carefully tailored protections for legitimate lawsuits, such as those where there are knowing violations of gun sale laws").

Finally, congressional concerns about vague standards leading to liability also support a reading of the predicate exception that is limited to firearms industry-specific statutes, rather than statutes of general applicability such as CUTPA. For example, in arguing in the House Judiciary Committee—seemingly inexplicably—*against* an amendment that would clarify that the arms act allows actions against gun dealers who knowingly sell firearms to a person who is on the violent gang and terrorist watch list maintained by the Department of Justice, Representative Christopher B. Cannon argued that "the vast number of co-sponsors of this bill would agree that the burden here should be on the [g]overnment to identify people and not create a vague standard that could be used again to destroy gun manufacturers

with lawsuits that don't have clarity, but cost a great deal of money." H.R. Rep. No. 109-124, supra, p. 126. Likewise, arguing in support of the arms act, Senator John Thune emphasized that the exceptions, including for violating the law in the production or sale of a firearm, "are not arbitrary standards . . . ." 151 Cong. Rec. 19,119 (2005).

Similarly, in opposing a bill amendment that would provide an exception to the arms act for "gross negligence" or "reckless conduct," Senator John Cornyn argued that the breadth of those terms "would actually gut the very underlying purpose of this legislation" because the pleading of such claims would broaden the scope of the discovery involved, and allow for greater harassment of the manufacturers via the litigation process. Id., 18,918. Senator Jon Llewellyn Kyl described the amendment as "a poison pill for the entire bill because, in effect . . . if you allege gross negligence or recklessness, then the exemption the bill provides evaporates. So you are a lawyer. All you do is allege gross negligence or recklessness and, bingo, you are back in court again. So it totally undercuts the purpose of this legislation."[19] Id., 18,919; see also id., 18,921, remarks of Senator Craig (arguing that gross negligence exception would render arms act "relatively meaningless as to where we are in relation to the kind of junk or dilatory lawsuits that are currently being filed against gun manufacturers and gun dealers who not only produce a legal product to the market but sell it in the legal context"). Senator Graham similarly emphasized how statutes affect a manufacturer's duty of care, stating that the arms act "doesn't let a seller or a distributor off the hook for violating a statute or making a sale illegally because it says, if you violate the law that exists, then you have broken a duty. Duty can be established by relationships. It can [also] be established by a statute. So this bill does not allow someone to sell a gun without following the procedures that we have set out to sell a gun. It doesn't allow someone to make a gun that is unsafe. You are on the hook, and you can be held accountable based on a simple negligence theory or a negligence per se theory if you violate a specific statute during the sale of a gun or manufacturing of a gun. But what this bill prevents, and I think rightfully so, is establishing a duty along this line: That you have a responsibility, even if you do a lawful transaction or make a safe gun, for an event that you can't control, which is the intentional misuse of a weapon in a criminal fashion by another person. That is the heart of this bill. It doesn't relieve you of duties that the law imposes upon you to safely manufacture and to carefully sell. But we are not going to extend it to a concept where you are responsible, after you have done everything right, for what somebody else may do who bought your product and they did it wrong and it is their fault, not yours. So it does not matter whether you use a gross

negligence standard, a simple negligence standard, you have blown by the concept of the bill in my opinion. The debate should be, is there a duty owed in this country for people who follow the law, manufacture safely, sell within the confines of the laws we have written at the [s]tate and [f]ederal level to the public at large if an injury results from the criminal act of another? If that ever happens, this country has made a major change in the way we relate to each other and a major change in the law." Id., 18,920. Accordingly, I conclude that the legislative history demonstrates that Congress contemplated that only those statutes providing clear standards with respect to the sale and marketing of firearms would serve as predicate statutes.

V

CONCLUSION

On the basis of my review of the text, case law, canons of construction, and legislative history, I conclude that predicate statutes under the predicate exception to the arms act, 15 U.S.C. § 7903 (5) (A) (iii), are limited to those specific to the sale and manufacture of firearms.[20] Compare *Phillips* v. *Lucky Gunner, LLC*, 84 F. Supp. 3d 1216, 1219–20, 1224 (D. Colo. 2015) (concluding in case arising from movie theater mass shooting that plaintiffs had not pleaded facts against ammunition sellers indicating knowledge of shooter's conduct and mental condition before shootings, and had not claimed that firearms sellers engaged in "noncompliance with the regulatory requirements applicable to [over the counter] sales," or that "the . . . defendants had any knowledge of the sales made by the others or by the local firearms dealers"), and *Jefferies* v. *District of Columbia*, 916 F. Supp. 2d 42, 45–46 (D.D.C. 2013) (claims against assault rifle manufacturer arising from shooting by third party are preempted by arms act when only statute pleaded was District of Columbia's Assault Weapons Manufacturing Strict Liability Act, D.C. Code § 7-2551 [2001]), with *Corporan* v. *Wal-Mart Stores East, LP*, United States District Court, Docket No. 16-2305-JWL (JWL) (D. Kan. July 18, 2016) (concluding that proposed amendments to complaint saved it from preemption because allegations supported "plausible claim" that defendants "knowingly violated certain specific provisions of the Gun Control Act of 1968," 18 U.S.C. § 921 et seq., with respect to straw purchase of firearm used in shooting), *New York* v. *A-1 Jewelry & Pawn, Inc.*, 252 F.R.D. 130, 132 (E.D.N.Y. 2008) (concluding that arms act preemption was inapplicable because "there are alleged in the instant action substantial violations of specific federal laws applicable to the sale and marketing of firearms which allegedly proximately cause harm to the [plaintiff]" including prohibitions on straw purchasing and violation of state nuisance statute specifically applicable to firearms [emphasis omitted]), and *Williams* v. *Beemiller, Inc.*,

100 App. Div. 3d 143, 148–50, 952 N.Y.S.2d 333 (2012) (concluding that plaintiffs "sufficiently alleged that defendants knowingly violated various federal and state statutes applicable to the sale or marketing of firearms within the meaning of the . . . predicate exception" when they alleged that federally licensed firearms dealer knowingly sold multiple handguns to straw purchaser under circumstances suggesting "trafficking in the criminal market rather than for their personal use because [1] they had purchased multiple guns on prior occasions; [2] they paid for the guns in cash; and [3] they selected Hi-Point 9mm handguns, which are 'disproportionately used in crime' and have 'no collector value or interest,' " with accomplice claims stated based on government notifications that "over 13,000 guns they sold had been used in crimes").

To determine whether CUTPA is a predicate statute under this standard, I consider that, as a matter of state law, "CUTPA is, on its face, a remedial statute that broadly prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . . [CUTPA] provides for more robust remedies than those available under analogous common-law causes of action, including punitive damages . . . and attorney's fees and costs, and, in addition to damages or in lieu of damages, injunctive or other equitable relief. . . . To give effect to its provisions, [General Statutes] § 42-110g (a) of [CUTPA] establishes a private cause of action, available to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by [General Statutes §] 42-110b . . . ." (Internal quotation marks omitted.) *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, 317 Conn. 602, 623, 119 A.3d 1139 (2015).

"[Section] 42-110b (a) provides that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either

an actual deceptive practice . . . or a practice amounting to a violation of public policy." (Internal quotation marks omitted.) *Ulbrich* v. *Groth*, 310 Conn. 375, 409–10, 78 A.3d 76 (2013).

"CUTPA, by its own terms, applies to a broad spectrum of commercial activity. The operative provision of [that] act, § 42-110b (a), states merely that '[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.' Trade or commerce, in turn, is broadly defined as 'the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of *any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state.*' General Statutes § 42-110a (4). The entire act is remedial in character; General Statutes § 42-110b (d); *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 615 n.4, 440 A.2d 810 (1981); and must 'be liberally construed in favor of those whom the legislature intended to benefit.' " (Emphasis added; footnote omitted.) *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 492, 656 A.2d 1009 (1995). "CUTPA, like equity, reaches beyond traditional common law precepts in establishing a fairness standard designed to grow and broaden and mold [itself] to meet circumstances as they arise . . . . The resolution of claims requiring the application of broadly defined and deeply rooted public values such as the statute's elusive, but [legislatively] mandated standard of fairness . . . has historically been the function of a court of equity."[21] (Citations omitted; internal quotation marks omitted.) *Associated Investment Co. Ltd. Partnership* v. *Williams Associates IV*, 230 Conn. 148, 159, 645 A.2d 505 (1994); see also id., 161–62 (no state constitutional right to jury trial of CUTPA claim).

In summary, whether this court agrees with Congress or not, in adopting the arms act, Congress adopted findings and statements of purpose in 15 U.S.C. § 7901; see footnote 1 of this dissenting opinion; which made very clear its intent to absolve defendants like these—gun manufacturers and distributors—from liability for criminal use of firearms by third parties except in the most limited and narrow circumstances and, particularly, to shield them from novel or vague standards of liability.[22] This court is obligated, therefore, to construe the predicate exception to the arms act, 15 U.S.C. § 7903 (5) (A) (iii), narrowly in light of that clear expression of congressional intent. See, e.g., *Trinity Christian School* v. *Commission on Human Rights & Opportunities*, 329 Conn. 684, 697–98, 189 A.3d 79 (2018) ("[i]t is not the province of this court, under the guise of statutory interpretation, to legislate . . . a [particular] policy, even if we were to agree . . . that it is a better policy than the one endorsed by the legislature as reflected in its statutory language" [internal quotation marks omitted]). Put differently, "[w]hen we construe

a statute, we act not as plenary lawgivers but as surrogates for another policy maker, [that is] the legislature. In our role as surrogates, our only responsibility is to determine what the legislature, within constitutional limits, intended to do." (Internal quotation marks omitted.) *State* v. *Salamon*, 287 Conn. 509, 520, 949 A.2d 1092 (2008). My analysis of the relevant statutory text, case law, canons of construction, and legislative history demonstrates that Congress intended to limit predicate statutes under that exception to those statutes that relate specifically to the sale and manufacture of firearms.[23] Consequently, I strongly disagree with the majority's conclusion that CUTPA, which is a broadly drafted state unfair trade practices statute applicable to all commercial entities in a variety of factual circumstances, comes within that exception.[24] Instead, I would conclude that, because CUTPA, both in its statutory text and in its implementation under the cigarette rule, reaches a range of commercial conduct that far exceeds the manufacture, marketing, and sale of firearms, it is not by itself a predicate statute. That state unfair trade practices statutes had not been used to hold firearms manufacturers civilly liable to crime victims[25] renders the plaintiffs' CUTPA claims particularly novel in the contemplation of Congress; see 15 U.S.C. § 7901 (a) (7) (2012); and, thus, subject to preclusion under the arms act.[26] I conclude, therefore, that the arms act preempts the plaintiffs' claims of immoral advertising in violation of CUTPA.[27] I, therefore, respectfully disagree with part V of the majority's opinion, and I would affirm the judgment of the trial court in its entirety.

Accordingly, I respectfully dissent.

[1] Section 7901 of title 15 of the United States Code provides: "(a) Findings
"Congress finds the following:

"(1) The Second Amendment to the United States Constitution provides that the right of the people to keep and bear arms shall not be infringed.

"(2) The Second Amendment to the United States Constitution protects the rights of individuals, including those who are not members of a militia or engaged in military service or training, to keep and bear arms.

"(3) Lawsuits have been commenced against manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended, which seek money damages and other relief for the harm caused by the misuse of firearms by third parties, including criminals.

"(4) The manufacture, importation, possession, sale, and use of firearms and ammunition in the United States are heavily regulated by Federal, State, and local laws. Such Federal laws include the Gun Control Act of 1968, the National Firearms Act [26 U.S.C. § 5801 et seq.], and the Arms Export Control Act [22 U.S.C. § 2751 et seq.].

"(5) Businesses in the United States that are engaged in interstate and foreign commerce through the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products that have been shipped or transported in interstate or foreign commerce are not, and should not, be liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended.

"(6) The possibility of imposing liability on an entire industry for harm that is solely caused by others is an abuse of the legal system, erodes public confidence in our Nation's laws, threatens the diminution of a basic constitutional right and civil liberty, invites the disassembly and destabilization of other industries and economic sectors lawfully competing in the free enterprise system of the United States, and constitutes an unreasonable burden on interstate and foreign commerce of the United States.

"(7) The liability actions commenced or contemplated by the Federal Government, States, municipalities, and private interest groups and others are based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States and do not represent a bona fide expansion of the common law. The possible sustaining of these actions by a maverick judicial officer or petit jury would expand civil liability in a manner never contemplated by the framers of the Constitution, by Congress, or by the legislatures of the several States. Such an expansion of liability would constitute a deprivation of the rights, privileges, and immunities guaranteed to a citizen of the United States under the Fourteenth Amendment to the United States Constitution.

"(8) The liability actions commenced or contemplated by the Federal Government, States, municipalities, private interest groups and others attempt to use the judicial branch to circumvent the Legislative branch of government to regulate interstate and foreign commerce through judgments and judicial decrees thereby threatening the Separation of Powers doctrine and weakening and undermining important principles of federalism, State sovereignty and comity between the sister States.

"(b) Purposes

"The purposes of [the arms act] are as follows:

"(1) To prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended.

"(2) To preserve a citizen's access to a supply of firearms and ammunition for all lawful purposes, including hunting, self-defense, collecting, and competitive or recreational shooting.

"(3) To guarantee a citizen's rights, privileges, and immunities, as applied to the States, under the Fourteenth Amendment to the United States Constitution, pursuant to section 5 of that Amendment.

"(4) To prevent the use of such lawsuits to impose unreasonable burdens on interstate and foreign commerce.

"(5) To protect the right, under the First Amendment to the Constitution, of manufacturers, distributors, dealers, and importers of firearms or ammunition products, and trade associations, to speak freely, to assemble peaceably, and to petition the Government for a redress of their grievances.

"(6) To preserve and protect the Separation of Powers doctrine and important principles of federalism, State sovereignty and comity between sister States.

"(7) To exercise congressional power under article IV, section 1 (the Full Faith and Credit Clause) of the United States Constitution."

[2] Section 7903 (5) (A) of title 15 of the United States Code provides: "In general

"The term 'qualified civil liability action' means a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party, but shall not include—

"(i) an action brought against a transferor convicted under section 924 (h) of title 18, or a comparable or identical State felony law, by a party directly harmed by the conduct of which the transferee is so convicted;

"(ii) an action brought against a seller for negligent entrustment or negligence per se;

"(iii) an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought, including—

"(I) any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a qualified product; or

"(II) any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving

a firearm or ammunition under subsection (g) or (n) of section 922 of title 18;

"(iv) an action for breach of contract or warranty in connection with the purchase of the product;

"(v) an action for death, physical injuries or property damage resulting directly from a defect in design or manufacture of the product, when used as intended or in a reasonably foreseeable manner, except that where the discharge of the product was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage; or

"(vi) an action or proceeding commenced by the Attorney General to enforce the provisions of chapter 44 of title 18 or chapter 53 of title 26."

[3] Section 7902 of title 15 of the United States Code provides: "(a) In general

"A qualified civil liability action may not be brought in any Federal or State court.

"(b) Dismissal of pending actions

"A qualified civil liability action that is pending on October 26, 2005, shall be immediately dismissed by the court in which the action was brought or is currently pending."

[4] The plaintiffs at issue in the present appeal are as follows: Donna L. Soto, administratrix of the estate of Victoria L. Soto; Ian Hockley and Nicole Hockley, coadministrators of the estate of Dylan C. Hockley; William D. Sherlach, executor of the estate of Mary Joy Sherlach; Leonard Pozner, administrator of the estate of Noah S. Pozner; Gilles J. Rousseau, administrator of the estate of Lauren G. Rousseau; David C. Wheeler, administrator of the estate of Benjamin A. Wheeler; Neil Heslin and Scarlett Lewis, coadministrators of the estate of Jesse McCord Lewis; Mark Barden and Jacqueline Barden, coadministrators of the estate of Daniel G. Barden; and Mary D'Avino, administratrix of the estate of Rachel M. D'Avino. See also footnote 2 of the majority opinion.

[5] The defendants are as follows: Bushmaster Firearms International, LLC; Freedom Group, Inc.; Bushmaster Firearms; Bushmaster Firearms, Inc.; Bushmaster Holdings, LLC; Remington Arms Company, LLC; Remington Outdoor Company, Inc.; Camfour, Inc.; Camfour Holding, LLP; Riverview Sales, Inc.; and David LaGuercia.

[6] It is not disputed that the AR-15 is a "qualified product" under the arms act. See 15 U.S.C. § 7903 (4) (2012) (defining " 'qualified product' " as "firearm . . . ammunition . . . or component part . . . that has been shipped or transported in interstate or foreign commerce"). For the sake of convenience and clarity, I use the word "firearm" in describing the reach of the arms act, understanding that word to be synonymous with the definition of "qualified product" under 15 U.S.C. § 7903 (4).

[7] Section 240.45 of New York's Penal Law (McKinney 2008) provided in relevant part: "A person is guilty of criminal nuisance in the second degree when:

"1. By conduct either unlawful in itself or unreasonable under all the circumstances, he knowingly or recklessly creates or maintains a condition which endangers the safety or health of a considerable number of persons; or

"2. He knowingly conducts or maintains any premises, place or resort where persons gather for purposes of engaging in unlawful conduct . . . ."

[8] Judge Katzmann also observed that this approach creates a "Catch-22," insofar as "the apparently insurmountable obstacle for the plaintiffs here is that the New York courts have not yet addressed the question—as such, the majority feels free to conclude that [the criminal nuisance statute] is not 'applicable' to the sale and marketing of firearms. Unlike, say, a fruit, which is edible long before someone has eaten it, or gasoline, which is flammable even before someone has ignited it, the majority finds that a state law is not applicable until a state court actually applies it." *New York* v. *Beretta U.S.A. Corp.*, supra, 524 F.3d 406–407. Judge Katzmann criticized this as inconsistent with the plain meaning of the word "applicable," and observed that it invited forum shopping in order for parties first to obtain a state court interpretation of the potentially applicable state law. Id., 407. Instead, Judge Katzmann would follow what he deemed to be the "plain meaning" of the predicate exception, concluding that [the] criminal nuisance statute could be applied to firearms by its general terms, and he would have certified to the New York Court of Appeals a question of state law, namely, "whether the . . . criminal nuisance statute . . . is in fact 'applicable to the sale and marketing of firearms.' " (Citation omitted.) Id. Although I disagree with Judge Katzmann's ultimate conclusion with respect to the plain meaning of the relevant statutory language, I nevertheless share his

other concerns with respect to the interpretation of the predicate exception.

[9] I also find unpersuasive the decision of the Indiana Court of Appeals in *Smith & Wesson Corp.* v. *Gary*, 875 N.E.2d 422, 431 (Ind. App. 2007), transfer denied, 915 N.E.2d 978 (Ind. 2009), to the extent that it concluded that the plain language of the predicate exception did not bar a city's claim of public nuisance against a gun manufacturer insofar as the nuisance statute is "capable of being applied" to the sale and marketing of firearms. I note, however, that the court emphasized that the allegations in the complaint satisfied the manufacturers' more restrictive reading of the predicate exception, because they claimed numerous violations of "statute[s] directly applicable to the sale or marketing of a firearm . . . ." Id., 432.

[10] I note that the plaintiffs in the present case have candidly acknowledged that the approach adopted by the Ninth Circuit in *Ileto* v. *Glock, Inc.*, supra, 565 F.3d 1126, is "more restrictive" than the Second Circuit's approach in *New York* v. *Beretta U.S.A. Corp.*, supra, 524 F.3d 404.

[11] The decision of the Ninth Circuit in *Ileto* was not unanimous. In dissent, Judge Marsha S. Berzon concluded that the plaintiffs' claims alleging violations of the California Civil Code were, in fact, saved by the predicate exception. See *Ileto* v. *Glock, Inc.*, supra, 565 F.3d 1146–47. Judge Berzon first observed that "the predicate exception cannot possibly encompass *every* statute that might be 'capable of being applied' to the sale or manufacture of firearms; if it did, the exception would swallow the rule, and no civil lawsuits would ever be subject to dismissal under the [arms act]. I therefore agree with the majority that a limiting principle must be found, and that rather than trying to locate it in the word 'applicable' itself, we must look to the predicate exception's surrounding words." (Emphasis in original.) Id., 1155. Judge Berzon determined that "the key to interpreting the predicate exception is [Congress'] use of the word 'knowingly' "; id.; insofar as "[a]pplying the [arms act's] predicate exception as written—that is, as applying to all statutes capable of being applied to the sale or marketing of firearms, but imposing an actual knowledge requirement—would prohibit a swath of lawsuits against firearms manufacturers and sellers, including those brought by municipalities for violations of no-fault or absolute liability statutes or those brought by individuals alleging vicarious liability under state tort law for the conduct of third parties of which the gun manufacturers or sellers were not aware." Id., 1163. Judge Berzon concluded that the various allegations in the plaintiffs' complaint supported their claim that the defendants "knowingly committed a range of acts in violation of California negligence and nuisance law" by engaging in sales and marketing practices that created "distribution channels that they *know* regularly provide guns to criminals and underage end users [and, despite information from government crime trace reports,] *knowingly* supply a range of disreputable distributors, dealers, gun shops, pawnshops, gun shows, and telemarketers in the [s]tate of California . . . ." (Emphasis in original; internal quotation marks omitted.) Id., 1156.

[12] The majority states that Congress intended that the arms act itself be narrowly construed, insofar as its proponents described it as a " 'narrow' " exemption intended only to curb " 'junk or abusive' " lawsuits seeking to charge the firearms industry liable for the acts of third parties who are beyond their control. See, e.g., 151 Cong. Rec. 18,084, 18,911, 19,137 (2005), remarks of Senator Larry Edwin Craig. I disagree with the majority that this generalized legislative history indicates any desire by Congress to depart from the usual rules of statutory construction. Indeed, in arguing in support of the arms act, Representative Cliff Stearns, its sponsor in the House of Representatives, suggested that it would "eliminate predatory lawsuits that would otherwise cripple an entire industry," and described numerous pending cases against manufacturers and dealers arising from criminal shootings, based on theories such as public nuisance and strict liability statutes; he emphasized that he "made these remarks to ensure that anyone trying to evade the letter and spirit of this legislation will have as little 'wiggle room' as possible." Id., 23,279–80.

I also note that frivolity remains in the eye of the beholder, and that the proponents of the arms act appear from their remarks, discussed in greater detail in part IV of this dissenting opinion, to employ that term in a manner different than its well established legal meaning. See, e.g., *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 254–55, 828 A.2d 64 (2003) ("an action is frivolous . . . if the client desires to have the action taken primarily for the purpose of harassing or maliciously injuring a person or if the lawyer is unable either to make a good faith argument on the merits of the action taken or to support the action taken by a good faith argument for an exten-

sion, modification or reversal of existing law" [emphasis omitted; internal quotation marks omitted]); cf. *Mareno* v. *Rowe*, 910 F.2d 1043, 1047 (2d Cir. 1990) (discussing rule 11 of Federal Rules of Civil Procedure), cert. denied, 498 U.S. 1028, 111 S. Ct. 681, 112 L. Ed. 2d 673 (1991). Accordingly, I emphasize that I do not view the plaintiffs' claims in the present case as frivolous in any way.

[13] I note that a related canon often applied is "ejusdem generis, or the principle that when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration." (Internal quotation marks omitted.) *Ali* v. *Federal Bureau of Prisons*, 552 U.S. 214, 223, 128 S. Ct. 831, 169 L. Ed. 2d 680 (2008).

[14] The majority relies on portions of the legislative history as indicating that "the record keeping and unlawful buyer illustrations were included in the final version of [the arms act] not in an effort to define, clarify, or narrow the universe of laws that qualify as predicate statutes but, rather, simply to stave off the politically potent attack that [the arms act] would have barred lawsuits like the one that had arisen from the widely reported beltway sniper attacks. There is no other plausible explanation for why Congress chose to modify the predicate exception language contained in the 2001 and 2003 bills, which otherwise was 'virtually identical' to the language in [the arms act]. 151 Cong. Rec. 2561 (2005), remarks of Senator Larry Edwin Craig; see also id., 18,096, remarks of Senator Craig (indicating that bill is same for all intents and purposes as version introduced during 108th Congress, with addition of clarifying examples)." The majority further notes that this "conclusion is bolstered by the fact that Congress was fully aware that there are many types of federal statutes and regulations, filling 'hundreds of pages,' that specifically govern the firearms industry. 151 Cong. Rec. 18,059 (2005), remarks of Senator Thomas Allen Coburn."

I respectfully disagree with this reading of the legislative history with respect to the import of the illustrative statutes in the predicate exception. Although I agree that the vitality of the beltway sniper lawsuit was a powerful political consideration during the enactment of the arms act, I view that action's basis in concrete record keeping and unlawful buyer violations simply as an exemplar of what Congress did not intend the arms act to preclude. With those exemplars included in the final version of the predicate exception, I am not at liberty simply to ignore their import in the construction of the statute as a whole. See, e.g., *United States* v. *Dauray*, supra, 215 F.3d 264 ("our role as a court is to apply the provision as written, not as we would write it" [internal quotation marks omitted]).

[15] As a general matter, I also agree with the observation of Judge Marsha S. Berzon, in her dissenting opinion in *Ileto* v. *Glock, Inc.*, supra, 565 F.3d 1126, that much of the legislative history of the arms act needs to be taken with a grain of salt. Judge Berzon aptly observed that "individual legislators at times suggested divergent views of what sorts of lawsuits the [arms act] would affect if it were passed into law. Some of those views appear perhaps implausibly narrow or implausibly broad, likely because the bill excited strong emotions from both its supporters and its opponents. As courts have long cautioned, however, the statements of single lawmakers do not establish congressional intent." (Footnote omitted.) Id., 1161–62.

[16] In contrast, opponents of the arms act roundly criticized it as a gift to the gun lobby that would deprive injured persons of the opportunity to hold the firearms industry responsible for turning a blind eye to criminal activity in the name of profits. See, e.g., 151 Cong. Rec. 18,065 (2005), remarks of Senator Dianne Feinstein ("[The arms act] has nothing to do with protecting lawful commerce; rather, it protects one segment of industry against the lawful interests of our [s]tates in remedying and deterring negligent conduct. . . . Its proponents argue that lawsuits need to be stopped in order to defend their view of the [s]econd [a]mendment. But that is pretense. This bill is a simple giveaway to one industry—the gun lobby. It is a special interest windfall."); id., 18,902, remarks of Senator Edward Moore Kennedy ("Instead of addressing the real issues that can make our country and our communities safer, we are considering a bill that will close the courthouse door to victims of gun crimes and give a free pass to the handful of gun dealers and gun manufacturers who sell firearms to terrorists and criminals. We are doing it to appease the special interests of the [National Rifle Association]."); id., 23,021, remarks of Representative James P. McGovern ("While the proponents of this bill claim that the intent of this legislation is to protect jobs at mom-and-pop gun stores from reckless lawsuits, the truth is that the bill is all about protecting profits for the gun industry. Ensuring its yearly profits, not protecting jobs nor safeguarding gun sales, is atop the

priorities of the gun industry."); id., 19,217, remarks of Senator Charles Ellis Schumer ("[I]t is shocking that we would spend our time giving unwarranted and unprecedented immunity to an industry whose products, when allowed into the hands of the wrong people, do incredible harm to innocent Americans. We even put off working on a defense bill to do this favor to the gun lobby.").

[17] I disagree with the majority's circular reliance on statements of legislators indicating that the arms act protects " 'law-abiding' " gun dealers and manufacturers, as suggesting that encompasses those who do not engage in violations of unfair trade practices acts. See, e.g., 151 Cong. Rec. 18,057 (2005), remarks of Senator Craig (observing that actions against firearms industry "all seek the same goal of forcing law-abiding businesses selling a legal product to pay for damages from the criminal misuse of that product"); id., 19,137, remarks of Senator Craig ("[w]hat we have crafted is a very narrow exemption from predatory lawsuits seeking to hold legitimate, law-abiding people responsible for the harm done by the misdeeds of people over whom they have no control"); id., 23,024, remarks of Representative Charles Foster Bass (arguing that arms act "protects licensed and law abiding firearms and ammunitions manufacturers and sellers from lawsuits that seek to hold them responsible for the crimes that third party criminals commit"). These statements, which are ambiguous and no more illuminating than the purpose of eliminating "frivolous" lawsuits, prove too much, as the arms act by its very terms shields gun manufacturers and dealers from the consequences of violating numerous laws, both common and statutory in nature, such as California's general tort statutes. See *Ileto* v. *Glock, Inc.*, supra, 565 F.3d 1136–38. Put differently, these remarks do nothing to answer the core question in the present appeal, which requires this court to consider whether such laws are indeed within the contemplation of the predicate exception.

[18] I recognize that the statements of opponents may be of limited value in discerning legislative intent. See, e.g., *National Woodwork Manufacturers Assn.* v. *National Labor Relations Board*, 386 U.S. 612, 639–40, 87 S. Ct. 1250, 18 L. Ed. 2d 357 (1967) ("[W]e have often cautioned against the danger, when interpreting a statute, of reliance upon the views of its legislative opponents. In their zeal to defeat a bill, they understandably tend to overstate its reach." [Internal quotation marks omitted.]). I find it telling, however, that Senator Edward Kennedy, in opposing the arms act, expressly recognized that it would protect firearms manufacturers who engage in just the kind of advertising that the plaintiffs in the present case claim is immoral in violation of CUTPA. Senator Kennedy stated that the "bill will even protect manufacturers that promote military-style weapons for use in battle in urban scenarios against any foe at any range. It protects manufacturers who brag about their weapons of war and spread them to our streets." 151 Cong. Rec. 19,121–22; see also id. ("Look at this advertisement from Vulcan: 'Vulcan Armament, the weapons of the special forces. From Afghanistan to Iraq, the guns of the special forces are now on sale in America.").

[19] Opponents of the proposed amendment to provide an exception to the arms act for "gross negligence" or "reckless conduct" also described it as unnecessary because they viewed such acts as likely to violate an existing federal or state statute. See 151 Cong. Rec. 18,919 (2005), remarks of Senator Kyl ("[Firearm manufacture and sale] is a highly regulated industry by law, by [f]ederal law and [s]tate law and even some local laws. And most of the acts that would meet the definition of gross negligence would already be in violation of law. And if they are in violation of law, they are not exempted from this legislation. We don't try to exempt any gun manufacturer for conduct which is in violation of law."); id., 18,922, remarks of Senator Hatch ("[v]irtually any act that would meet the definition of gross negligence referenced in this amendment would already be a violation of [f]ederal, [s]tate or local law, and therefore would not receive the protection of this law anyway"); id., 19,118, remarks of Senator Craig (discussing rejection of gross negligence exception and arguing that arms act "does not take away the standards of law and the specifications within the [f]ederal law today as it relates to the responsible and legal operation and performance of a gun manufacturer or a licensed [f]ederal firearms dealer").

[20] My research indicates that the limited academic commentary on this issue also supports this interpretation of the predicate exception. See K. Armstrong, "Nigh-Impenetrable: Firearm Manufacturer Liability under the Protection of Lawful Commerce in Arms Act in a Post-*Heller* World," 28 Geo. Mason U. C.R. L.J. 173, 195 (2018) ("[s]tatutes qualifying for the predicate exception must not be of general applicability and cannot be codified general

tort claims"); R. Sorensen, "The Ninth Circuit Forecloses a Bullet Sized Hole in the PLCAA in *Ileto* v. *Glock*, 565 F.3d 1126 (9th Cir. 2009)," 35 S. Ill. U. L.J. 573, 595 (2011) ("[F]uture courts should only find statutes expressly regulating the firearm industry to be 'applicable to the sale or marketing of firearms.' It is through this narrow definition that the [arms act's] intended goal is realized."); see also J. Sonner, "A Crack in the Floodgates: New York's Fourth Department, the PLCAA, and the Future of Gun Litigation After *Williams* v. *Beemiller*," 61 Buff. L. Rev. 969, 984 (2013) ("The elusive definition remains—a law applicable to gun sales or marketing whose violation proximately causes harm for which relief is sought—without any clarification of 'applicable.' The Second Circuit hinted at a [less strict] approach, but no clear standard has emerged to determine whether a law or regulation *indirectly* concerning the gun industry may serve as a predicate statute." [Emphasis in original; footnote omitted.]); S. Wagman, "No One Ever Died from Copyright Infringement: The Inducement Doctrine's Applicability to Firearms Manufacturer Liability," 32 Cardozo L. Rev. 689, 720 (2010) ("While it is apparent that the [arms act] is meant to protect firearms manufacturers from third party liability in instances of unintentional support of third party gun violence, instances in which manufacturers have induced harm should not be barred under [the arms act]. When manufacturers either intentionally or recklessly support illegal firearms markets, they are inducing a public nuisance; therefore the predicate exception should be triggered and claims should be allowed to proceed."); but see J. Selkowitz, Note, "Guns, Public Nuisance, and the PLCAA: A Public Health-Inspired Legal Analysis of the Predicate Exception," 83 Temp. L. Rev. 793, 827–28 (2011) (suggesting that examples in predicate exception are consistent with promotion of public health, permitting maintenance of statutory public nuisance action "alleging that the gun industry, in violation of statute, created an environment dangerous to the public's health").

[21] I also strongly disagree with the majority's contention that the theory of liability underlying the plaintiffs' CUTPA claims "is not novel" and "does [not] sound in tort," and, therefore, are not within the scope of claims that the arms act seeks to preempt. The Second Circuit has aptly observed that "[u]nfair trade practices found their origin in the common law of torts . . . ." *United States* v. *Meldish*, 722 F.2d 26, 28 (2d Cir. 1983), cert. denied, 465 U.S. 1101, 104 S. Ct. 1597, 80 L. Ed. 2d 128 (1984); see also, e.g., *Kenney* v. *Independent Order of Foresters*, 744 F.3d 901, 907 (4th Cir. 2014) (West Virginia unfair trade practices act claim "sounds in tort" given type of relief available under statute and sought in complaint); *Ins. Co. of North America* v. *Della Industries, Inc.*, 998 F. Supp. 159, 164 (D. Conn. 1998) (CUTPA is tort claim for purposes of assignment under Uniform Commercial Code), vacated on other grounds, 229 F.3d 1135 (2d Cir. 1999); R. Langer et al., 12 Connecticut Practice Series: Connecticut Unfair Trade Practices, Business Torts and Antitrust (2018) § 2.1, p. 13 (noting that CUTPA "has brought both expanded remedies and broad and indefinite substantive standards to the law of business torts").

Given the potential for liability and remedy available under CUTPA, which is broader than that available at common law; see, e.g., *Associated Investment Co. Ltd. Partnership* v. *Williams Associates IV*, 230 Conn. 148, 159, 645 A.2d 505 (1994); I disagree with the logic behind the majority's premise that Congress intended the arms act to preempt state common-law claims, but leave undisturbed even broader sources of liability under state unfair trade practice statutes like CUTPA. See *District of Columbia* v. *Beretta U.S.A. Corp.*, supra, 940 A.2d 171 n.6 (court relied on findings in 15 U.S.C. § 7901 [a] [3] and [7], and rejected plaintiffs' reliance on congressional expression of "concern with liability actions 'without foundation in hundreds of years of the common law' and that 'do not represent a bona fide expansion of the common law' " as standing for proposition that "Congress was substantially less troubled by the existence of statutory liability actions reflecting judgments 'by the legislatures of the several [s]tates' " because "[n]o such distinction . . . is reflected either in the definition of a 'qualified civil liability action' or in the enumerated actions excluded therefrom, including the predicate exception; and to posit one all the same would ignore [Congress'] objection to '[l]awsuits" as a class [unless excepted] that 'seek money damages and other relief [against manufacturers and sellers] for the harm caused by the misuse of firearms by third parties, including criminals' " [emphasis omitted]).

[22] I disagree with the majority's argument that the sponsors of the arms act "emphasized that their primary concern was *not with lawsuits such as the present action*, in which individual plaintiffs who have been harmed in

a specific incident of gun violence seek to hold the sellers responsible for their specific misconduct in selling the weapons involved. . . . Many proponents indicated that their intent was to preclude the rising number of instances in which municipalities and 'anti-gun activists' filed 'junk' or 'frivolous' lawsuits targeting the entire firearms industry." (Citation omitted; emphasis added.) The majority's assertion that the sponsors of the arms act did not desire to foreclose claims by individual plaintiffs who had suffered specific harm from an instance of gun violence is an overly generous reading of the legislative history. The legislative history indeed indicates that Congress specifically rejected proposed amendments that would have provided two groups of politically sympathetic individual plaintiffs, namely children and law enforcement officers injured in the line of duty, with relief from the strictures of the arms act. See 151 Cong. Rec. 19,116–17 (2005), remarks of Senator Frank Raleigh Lautenberg (proposing exception for children); id., 19,125–26, remarks of Senator Jon Stevens Corzine (proposing law enforcement exception); H.R. Rep. No. 109-124, supra, pp. 64–65, remarks of Representative Sheila Jackson Lee (proposing exemption for children); H.R. Rep. No. 109-124, supra, pp. 110–11, remarks of Representative Zoe Lofgren (describing potential effect of arms act on case of New Jersey police officers who brought action against gun dealer who sold weapons to straw buyer despite his suspicions).

[23] I agree with the majority that the "regulation of advertising that threatens the public health, safety, and morals has long been considered a core exercise of the states' police powers." See, e.g., *Lorillard Tobacco Co.* v. *Reilly*, 533 U.S. 525, 541–42, 121 S. Ct. 2404, 150 L. Ed. 2d 532 (2001). Nevertheless, I find overbroad the majority's reliance on the well established presumption that "Congress does not intend to supersede the historic police powers of the [s]tates absent clear intent . . . ." (Internal quotation marks omitted.) *Federal Housing Finance Agency* v. *Nomura Holding America, Inc.*, 873 F.3d 85, 112 n.30 (2d Cir. 2017); see also, e.g., *Altria Group, Inc.* v. *Good*, 555 U.S. 70, 77, 129 S. Ct. 538, 172 L. Ed. 2d 398 (2008); *Medtronic, Inc.* v. *Lohr*, 518 U.S. 470, 485, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (1996). The majority's heavy reliance on this presumption elevates it beyond the more holistic preemption inquiry undertaken when the statutory language is ambiguous, as we consider the statute's "structure and purpose . . . as a whole . . . as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." (Citation omitted; internal quotation marks omitted.) *Medtronic, Inc.* v. *Lohr*, supra, 486. In contrast, my review of the legislative history, and particularly the remarks of members of Congress expressing their concerns over the breadth of a gross negligence exception and the potential for vague standards of liability, indicates that Congress would not have contemplated letting a broadly worded state unfair trade practice statute like CUTPA be used to eviscerate its intent to protect firearms manufacturers and dealers from litigation arising from shootings perpetrated by third parties. See part IV of this dissenting opinion.

[24] I also note that the majority observes that certain members of Congress "were committed to Americans' second amendment freedoms and sought to secure those freedoms by immunizing firearms companies from frivolous lawsuits." Citing recent federal cases considering the constitutionality of bans on "assault weapons" and "high capacity magazines," the majority also notes, however, that "[i]t is not at all clear . . . that the second amendment's protections even extend to the types of quasi-military, semiautomatic assault rifles at issue in the present case." See, e.g., *Kolbe* v. *Hogan*, 849 F.3d 114, 136 (4th Cir.) (AR-15 with high capacity magazine is "weapon of war" excluded from second amendment coverage), cert. denied,     U.S.     , 138 S. Ct. 469, 199 L. Ed. 2d 374 (2017); *New York State Rifle & Pistol Assn., Inc.* v. *Cuomo*, 804 F.3d 242, 257–61 (2d Cir. 2015) (assuming, arguendo, that second amendment protections extend to assault rifles, but concluding that ban on such weapons survives intermediate scrutiny). My review of the legislative history and statutory text does not indicate any intent by Congress to identify predicate statutes by examining various nuances of second amendment law. Because the degree to which the second amendment protects the AR-15 is, therefore, not at issue in this appeal, I do not consider that question further.

[25] The majority states that it "must [be] presum[ed] that Congress was aware, when it enacted [the arms act], that both the [Federal Trade Commission] Act and state analogues such as CUTPA have long been among the primary vehicles for litigating claims that sellers of potentially dangerous

products such as firearms have marketed those products in an unsafe and unscrupulous manner." The majority then cites cases from this state for the proposition that "CUTPA . . . has been applied to the sale of firearms," and decisions from other jurisdictions for the proposition that "regulation of firearms advertising in our sister states frequently has been accomplished under the auspices of state consumer protection and unfair trade practice laws." In my view, these decisions stand only for the proposition that wide reaching unfair trade practice statutes are as applicable to the firearms industry as they are to any other business; they have nothing at all to do with the arms act or the predicate exception. See *Melton* v. *Century Arms, Inc.*, 243 F. Supp. 3d 1290, 1296–97, 1305–1306 (S.D. Fla. 2017) (rifle owners brought, inter alia, Florida unfair trade practices act claim arising from advertising and sale of AK-47 rifles with known design defect that allows accidental discharge); *FN Herstal, S.A.* v. *Clyde Armory, Inc.*, 123 F. Supp. 3d 1356, 1375–76 and n.105 (M.D. Ga. 2015) (firearms manufacturer brought trademark infringement claims against firearms distributor and retailer under federal Lanham Act and Georgia deceptive trade practices law), aff'd, 838 F.3d 1071 (11th Cir. 2016), cert. denied,    U.S.   , 137 S. Ct. 1436, 197 L. Ed. 2d 649 (2017); *Beretta U.S.A. Corp.* v. *Federal Ins. Co.*, 117 F. Supp. 2d 489, 492 (D. Md. 2000) (whether products hazard liability exclusion in commercial general liability policy relieved insurer of duty to defend and indemnify firearms manufacturer against claims of violations of state unfair trade practices statutes arising from "deceptive marketing and advertising of its products, by promoting the false notion that gun ownership and possession of handguns in the home increases one's security"), aff'd, 17 Fed. Appx. 250 (4th Cir. 2001); *People* v. *Arcadia Machine & Tool, Inc.*, Docket No. 4095 (VPD), 2003 WL 21184117, *26 (Cal. Super. April 10, 2003) (denying summary judgment in pre-arms act case on claim that Ohio gun distributor engaged in deceptive advertising "by advertising banned assault weapons in a manner that is likely to mislead potential California purchasers to believe that purchase and possession of such weapons is lawful, thereby creating an illegal market for such firearms in California"), aff'd sub nom. *In re Firearm Cases*, 126 Cal. App. 4th 959, 24 Cal. Rptr. 3d 659 (2005); *American Shooting Sports Council, Inc.* v. *Attorney General*, 429 Mass. 871, 882, 711 N.E.2d 899 (1999) ("[T]he Attorney General's regulatory authority under [state unfair trade practices act] regarding defective products is not limited to marketing and disclosure issues as the plaintiffs contend. His authority properly extends to regulating the sale of a product as unfair or deceptive when the product is defective in ways which a purchaser would not anticipate or the product is not as warranted, and to regulating in a manner which coordinates [unfair trade practices] liability with legislation declaring certain acts unlawful."); Opinions, N.M. Atty. Gen. No. 77-23 (July 19, 1977) p. 149 ("There is nothing in [statute prohibiting carrying of firearms in liquor establishment] which makes it unlawful to advertise the sale of firearms in a liquor establishment, but since the liquor establishment cannot sell firearms, the advertising of the sale of firearms in the liquor establishment would constitute false advertising and an unfair or deceptive trade practice. . . . Of course, this is not intended to mean that the advertising of firearms as a general principle is forbidden in liquor establishments, but that any business establishment could not advertise something that it does not sell since that would be in violation of the statutes cited." [Citations omitted.]).

The majority's reliance on two Connecticut cases, namely, *Ganim* v. *Smith & Wesson Corp.*, 258 Conn. 313, 780 A.2d 98 (2001), and *Salomonson* v. *Billistics, Inc.*, Superior Court, judicial district of New London, Docket No. CV-88-508292 (September 27, 1991), for the proposition that CUTPA has been previously applied to the sale and marketing of firearms is similarly unavailing. As the majority recognizes, this court's decision in *Ganim* was limited to a conclusion that municipalities lacked standing to pursue claims against firearms manufacturers and sellers for harms arising from gun violence. *Ganim* v. *Smith & Wesson Corp.*, 365. Indeed, the court specifically declined to address the substantive legal issues presented in that case, including whether firearms manufacturers and sellers may be held liable under CUTPA for "unfair and deceptive advertising" and "unfair and deceptive sales practices," as supported by allegations that the firearms manufacturers and dealers "marketed and sold their handguns in a manner that causes harm to individuals, especially young children in Bridgeport; marketed and sold their handguns in a manner that contributes to homicides, suicides and accidental deaths in Bridgeport; and engaged in a campaign of misrepresentation concerning the dangers of their handguns" and that

they "sell excessive numbers of guns to individual buyers, knowing or having reason to know that some or all of those guns are not for personal use, and are likely to be resold illegally and used to commit crimes; and sell guns that fail to incorporate feasible safety devices that would prevent misuse by unauthorized and unintended users." Id., 334–36. Accordingly, this court's decision in *Ganim* about the plaintiffs' standing in that case has absolutely no precedential value with respect to the viability of a CUTPA claim founded on the "immoral advertising" of firearms.

The Superior Court's decision in *Salomonson* is even more inapposite than *Ganim*. *Salomonson*, which is a report of an attorney trial referee rather than a decision of a judge of the Superior Court, does not involve crime or victims of crime, but instead is a routine business dispute, in which the court held that a gun fabricator violated CUTPA by failing to perform under a contract to convert three semi-automatic rifles to fully automatic weapons, including by obtaining necessary federal regulatory approvals. See *Salomonson* v. *Billistics*, *Inc.*, supra, Superior Court, Docket No. CV-88-508292.

[26] The majority speculates about what Congress would have intended with respect to preemption in relation to an elaborate hypothetical about a "terrible crime like the ones involved in the Sandy Hook massacre" perpetrated by a "troubled young man" who had watched a firearms seller's "explicit advertisements depicting and glorifying school shootings, and promot[ing] its products in video games, such as 'School Shooting,' that glorify and reward such unlawful conduct." The majority posits that "even the most ardent sponsors of [the arms act] would not have wanted to bar a consumer protection lawsuit seeking to hold the supplier accountable for the injuries wrought by such unscrupulous marketing practices." The majority then observes "that is not this case, and yet the underlying legal principles are no different. Once we accept the premise that Congress did not intend to immunize firearms suppliers who engage in truly unethical and irresponsible marketing practices promoting criminal conduct, and given that statutes such as CUTPA are the only means available to address those types of wrongs, it falls to a jury to decide whether the promotional schemes alleged in the present case rise to the level of illegal trade practices and whether fault for the tragedy can be laid at their feet." I do not share the majority's apparent optimism about the 109th Congress, which passed the arms act; specifically, until those who ply their judicial craft at One First Street tell me differently, I do not believe that they would have been inclined to allow the use of a broadly drafted statute like CUTPA to hold a firearm manufacturer or seller involved in such a hypothetical liable for anything more than thoughts and prayers. Put differently, the arms act would preempt recourse unless the immoral and repugnant practices described by the majority violated a statute or regulation specifically governing the manner in which firearms may be advertised or marketed, as opposed to a more broadly applicable statute like CUTPA.

[27] I emphasize that my conclusion is limited to CUTPA claims that do not rely on firearms-specific statutes as their source of public policy, insofar as I conclude only that CUTPA itself is not a predicate statute. Put differently, I do not conclude that the arms act preempts all CUTPA causes of action, but only that the predicate exception does not save those that do not allege the violation of a firearms-specific regulation or statute. See *Ileto* v. *Glock*, *Inc.*, supra, 565 F.3d 1133 (noting distinction between right of action and predicate statute for purposes of arms act); cf. *Sturm* v. *Harb Development*, *LLC*, 298 Conn. 124, 139, 2 A.3d 859 (2010) ("[a]lthough CUTPA is primarily a statutory cause of action . . . it equally is recognized that CUTPA claims may arise from underlying causes of action, such as contract violations or torts, provided the additional CUTPA elements are pleaded" [citation omitted]).